**IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALAN RESNICK and BETH POLLARD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| BAYER HEALTHCARE LLC and MERIAL LIMITED, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs Alan Resnick ("Resnick"), and Beth Pollard ("Pollard") and all other persons similarly situated to them ("Plaintiffs") individually and on behalf of all similarly situated people ("the Class" as defined herein), allege by way of Complaint against Defendants Bayer Healthcare LLC ("Bayer"), and Merial Limited ("Merial", collectively with Bayer, "Defendants"), upon personal knowledge as to themselves, their beliefs and their own acts, and to all other matters upon information and belief, based upon, *inter alia*, the investigation made by their attorneys, allege as follows:

**I.      Nature of the Action**

1.  Defendant Bayer is the manufacturer of the family of products made for dogs and cats under the trade names Advantage®, Advantage® II, Advantix®, Advantix® II, K9 Advantix®, K9 Advantix® II, Advantage Multi®, Advantage Multi® II and Advocate® (collectively "Bayer Products").

2. Defendant Merial is the manufacturer of the family of products made for dogs and cats under the trade names Frontline®, Frontline® Plus, Frontline® Top Spot, and Certifect™ (collectively "Merial Products").

3. Defendant Bayer sells Bayer Products and Defendant Merial sells Merial Products (collectively "Defendants' Products") as treatments for dogs and cats (a "Pet" or "Pets") suffering with fleas, ticks, adult flea eggs, larvae, mosquito, heart worm, ear mites, and sarcoptic mange. While each one of Defendants' Products, individually, targets only a limited subset of the foregoing Pet aliments, all of Defendants' Products target fleas and their larvae.

4. Defendants collectively sell approximately $2 billion dollars of the Defendants' Products annually under the false and misleading assertions (collectively "Defendants' False Claims") that Defendants' Products:

   a. are self-dispersing and cover the entire surface area of a Pet's body when applied in a single limited spot;

   b. are effective for one month and require monthly application to continue to be effective;

   c. do not enter the blood stream of the Pet and instead move across the Pet's skin to cover the Pet; and

   d. are waterproof and remain effective following shampoo treatments, swimming, or after exposure to rain or sunlight.

5. In this action, Plaintiffs seek to enjoin Defendants from continuing to misrepresent Defendants' Products and to recover damages, equitable, and other relief available, from Defendants, on behalf of all those who purchased Defendants' Products.

## II.   Parties, Jurisdiction, and Venue

6.   Plaintiffs are citizens of the State of Illinois and reside within the judicial district for the Northern District of Illinois.

7.   Bayer is a foreign limited liability company organized and existing under the laws of the State of Delaware, whose principal place of business is in Germany and who manufactures the Bayer Products that are sold nationwide.

8.   Bayer's Animal Science Division Headquarters has its principal place of business at Shawnee, Kansas.

9.   Bayer Corporation also has a principal place of business in Pittsburgh, Pennsylvania.

10.   Merial is a wholly owned subsidiary of Sanofi-Avantis, a French corporation.  Merial is organized and exists under the laws of the State of Georgia, and maintains its principal place of business in Duluth, Georgia.  Merial manufactures the Merial Products that are sold nationwide.

11.   Jurisdiction is proper in this Court pursuant to: (a) 28 U.S.C. § 1331, because this case involves a federal question; and (b) 28 U.S.C. § 1332(d), because this is a class action lawsuit in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of the State of Illinois, hence a different state than that of the Defendants;

12.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Plaintiffs reside in this District, and a substantial portion of the events and omissions giving rise to this action occurred in this District.

## III.   Factual Allegations Concerning Plaintiffs Alan Resnick and Beth Pollard

13.   Resnick purchased K-9 Advantix and Frontline® Plus within the past twelve months to treat fleas on his dog.

14. Pollard purchased Frontline Plus and K-9 Advantix within the past twelve months to treat fleas on her dog.

15. Resnick and Pollard and their Pets were damaged as a result of Defendant's False Claims.

**IV. Background Facts Concerning Defendants' Products**

16. Imidacloprid is the active ingredient, as a flea adulticide, in the Bayer Products.

17. Fipronil is the active ingredient, as a flea adulticide, in the Merial Products (Imidacloprid and Fipronil are hereinafter collectively referred to as the "Active Ingredients").

18. The Active Ingredients are insecticides that have been available as bulk products for more than a decade.

19. The Active Ingredients that Defendants sell within the Defendants' Products is a smaller quantity version of the bulk product, but which Defendants sell at a significantly higher price per unit of Active Ingredient than the price for the more concentrated Active Ingredients sold the bulk product.

20. Imidacloprid must make physical contact with a flea or a tick to kill the flea or a tick.

21. Fipronil must make physical contact with a flea or a tick to kill the flea or a tick

22. In Defendants' advertising, marketing, promotional materials, and company-sponsored scientific research publications for Defendants' Products, Defendants state that Defendants' Products:

      a.      Kill fleas and ticks on Pets; and

      b.      Prevent fleas from establishing infestation on Pets.

23.   The directions for using Bayer Products instruct consumers and veterinarians to only place a few drops of Bayer Products medication on the skin of the Pet ("Bayer Product Spot On Treatment").

24.   The directions for using Merial Products instruct consumers and veterinarians to only place a few drops of Merial Products on the skin of the Pet ("Merial Product Spot On Treatment", collectively with Bayer Product Spot On Treatment, the "Defendants' Spot On Treatment").

**V.      Defendants' False Claims**

    **A.      Defendants' Products Are Not Self-Dispersing and No Translocation Occurs**

25.   Bayer asserts in its marketing, advertising, and promotional materials for Bayer Products that, within a matter of hours after applying a Bayer Product Spot On Treatment, Imidacloprid will spread by "translocation" over all or most of the skin surface area and hair of the Pet that received the Bayer Product Spot On Treatment. (the "Bayer Translocation Claim").

26.   Merial asserts in its marketing, advertising, and promotional materials for Merial Products that, within a matter of hours after applying a Merial Product Spot On Treatment, Fipronil will spread by "translocation" over all or most of the skin surface area and hair of the Pet that received the Merial Spot on Treatment (the "Merial Translocation Claim", collectively with the "Bayer Translocation Claim" are referred to as "Defendants' Translocation Claims").

27.   Defendants' Translocation Claims are false.

    **1.      Defendant Bayer's Specific False Translocation Claim Statements**

28.   Bayer made the following claims:

    a.   "After topical application of the product, imidacloprid is rapidly distributed over the animal's skin within one day of application. It can be detected on the body

surface throughout the 28-day treatment interval. Imidacloprid localizes in the lipid layer of the skin surface, which spreads not only over the surface of the skin but also onto the hair."[1]

b. "Clinical and laboratory studies have shown that imidacloprid is distributed over the surface of the skin of treated animals. In the environment in which the animal lives, physiological cutaneous exchange disperses the cutaneous detritus (scurf) which carries infinitesimal quantities of imidacloprid."

c. Bayer has a website with the web addresses www.nofleas.com and www.petparents.com, which contains the same false Bayer Translocation Claim regarding Bayer Products.

d. In a document entitled "Pharmacokinetics" Bayer states, "Detailed research has shown that following application, imidacloprid is localized in the water resistant lipid layer of the skin surface and is then spread over the body surface and onto the hair."[2]

e. In the same document Bayer displays the below graphic representation of the Bayer Translocation Claim:

---

[1] http://www.animalhealth.bayerhealthcare.com/4890.0.html

[2] http://www.advocatespoton.com/fileadmin/media/advocate/pdf/Advocate_TM_2_Pharmacokinetics.pdf



| 1 minute | 5 minutes | 2 hours | 6 hours | 24 hours |

*Figure 1: Distribution of imidacloprid after topical application*

29.  The Bayer Translocation Claim process described in the foregoing paragraphs is false, deceptive and inaccurate.

30.  Bayer utilizes the following research to support the Bayer Translocation Claim.

    *a.*  FLEA BIOLOGY AND CONTROL by F. Kramer and N. Mencke. (2001), p. 102. ("Kramer & Mencke"):[3]

        *i.*  Kramer & Mencke fail to provide any source for the claimed rate of "Distribution of imidacloprid after topical application" referring only to "other sources" without citation;

        ii.  Kramer & Mencke state that "[imidacloprid] is spread through the coat of dogs and the fur of cats within twelve hours post application (p.a.) to

---

[3] Dr. Mencke at the time of publication of Kramer & Mencke was an employee of Bayer AG, BG Animal Health, BU Companion Animals.  Upon information and belief, Dr. Mencke is, as of the filing of this Complaint, the Director of Global Veterinary Services, Global Marketing, Bayer HealthCare AG Animal Health Division, Monheim, Germany.

cover the entire body and could be detected in studies of Fichtel (1998) in this medium over the whole 28 day period after application"; and

iii. The reference to Fichtel (1998) is to an unpublished paper, Fichtel, M. (1998) "Untersuchungen zur Wirkung des Adultizides Imidacloprid auf den KatzenflohCtenocephalides felis (Bouché) an Hund und Katze" ("Investigations Of The Effect Of The Adulticide Imidacloprid Against The Cat Flea Ctenocephalides Felis (Bouché) On Cats And Dogs"). Dissertation, Freie Universität Berlin, Fachber Vet Med, Berlin (the "Fichtel Dissertation"), and the Fichtel Dissertation provides no support for the Bayer Translocation Claim.

b. The study entitled "Skin Distribution of Imidacloprid by Microautoradiography After Topical Administration to Beagle Dogs" (2010) was funded by Bayer Animal Health[4] ("2010 Study"). Upon information and belief, the 2010 Study was created in order to retroactively create a scientific foundation for Bayer's claims.

i. The 2010 Study states that "The physicochemical properties of imidacloprid and its distribution across the canine haircoat and skin (currently thought to be via body oil) are assumed to be responsible for the proven efficacy of Advantage® Topical Solution against fleas for 1 month."

---

[4] https://s3.amazonaws.com/assets.prod.vetlearn.com/10/8f14e06c5411e090fc0050568d17ce/file/VTX1210_chopade.pdf

   ii. The study assumed, without proving, that imidacloprid distributed itself across a Pet's body.

  c. Jim E. Riviere and Mark G. Papich, Veterinary Pharmacology and Therepeutics, (2009) ("Riviere & Papich Book") is a reference book used by veterinarians. The publisher of the Riviere & Papich Book refers to the reference book as the "gold-standard reference on veterinary pharmacology and therapeutics."

   i. Bayer provided information to be placed in the Riviere & Papich Book.

   ii. The Riviere & Papich Book states, under the heading "Pharmacokinetics", that: "Topical application of imidacloprid to the skin does not result in significant dermal absorption in the bloodstream, but rather surface translocation aided by body movement resulting in whole body coverage. Its efficacy is dependent on contact with the flea at the surface of the animal's skin."[5]

31. The research cited by Bayer in the foregoing paragraph in support of Bayer's Translocation Claim is false, deceptive and inaccurate.

32. Upon information and belief, Bayer willfully and knowingly made and disseminated the foregoing false Bayer Translocation Claim to induce veterinarians to recommend, prescribe, sell, or dispense Bayer Products and to cause consumers to purchase Bayer Products.

  **2.**  **Defendant Merial's Specific False Translocation Claim Statements**

33. Merial made the following claims:

_____

[5] Riviere & Papich Book, p. 1188.

a. Frequently Asked Questions ("FAQs") for Frontline, located at http://frontline.us.merial.com/hlp_faq.asp states: "How do FRONTLINE® Top Spot and FRONTLINE® Plus spread over a pet's body? How long does this take? FRONTLINE® Top Spot and Plus spread over the pet's body by a process called translocation. When applied, these products are gradually dispersed by the pet's natural oils, collecting in the oil glands in the skin. It is then "wicked" onto the hair over the next 30 days. The translocation process can take up to 24 hours to complete."

b. "FRONTLINE® PLUS effectively targets Fleas throughout all life stages. Fipronil collects in the oils of the skin and hair follicles and continues to be released from hair follicles onto the skin and coat resulting in long-lasting activity against fleas, ticks and chewing lice."

c. Merial has published an advertisement in Trends Magazine, amongst other publications, with the title "*How It Works Is Why It Works So Well*"[6] stating "Stored in the sebaceous glands, FRONTLINE® Plus is wicked out of the hair follicles and continuously re-applied to the coat to provide long-lasting, waterproof protection."

d. In the *How It Works Is Why It Works So Well* ad, Merial claims that Frontline® kills 100% of fleas within 12 hours of application.

---

[6] http://content.yudu.com/A1nb98/Apr2010/resources/50.htm

e.  Merial in 2011 introduced an advertising campaign entitled "Complete Killer."[7]

("Complete Killer Campaign").  The Complete Killer Campaign features a video

entitled "Born to Kill."[8]   The video shows ninja-like figures representing the

Frontline® product running on the surface of a dog killing fleas.  As shown in

the photo below, the Merial video depicts the speed with which Merial claims

Frontline® spreads across the surface and hair of Pets killing every flea in its

path.



f.  Merial's Complete Killer Campaign also has a page entitled "Questions

Answered."[9]   The Questions Answered states "**How does the killing force of**

_____

[7] http://www.completekiller.com/

[8] http://www.completekiller.com/meet-the-force/

[9] http://www.completekiller.com/killing-101/questions-answered/

**FRONTLINE® Plus kill fleas and ticks?** Aside from their sweet ninja moves, the force has two secret weapons: fipronil and (S)-methoprene. Once FRONTLINE® Plus is applied, this combo stores itself in the oil glands under your pet's skin. It then self-distributes continuously for one month to your pet's hair and skin through the hair follicles. Any flea or tick that comes in contact with your pet is dead meat."

34. The Merial Translocation Claim process described in the foregoing paragraph is false, deceptive and inaccurate.

35. Merial utilizes the following research to support the Merial Translocation Claim:

    a.   The Veterinary Drug Handbook Fourth Edition (the "VDH") is a reference volume used by Veterinarians.

          i.   Merial provided information to be placed in the VDH.

          ii.   The VDH contains a section on Fipronil which states, under the heading "Pharmakokinetics", that: "Following topical application, [Fipronil] apparently spreads over the body by translocation (over whole body in about 25 hours). Manufacturers information: collects in skin oils and hair follicles, then released over a long period of time."

    b.   Gupta, R.C., VETERINARY BIOLOGY: BASIC AND CLINICAL PRINCIPLES (2007) ("Gupta Textbook") is a textbook used to train veterinarians.

          i.   Merial provided information to be placed in the Gupta Textbook.

          ii.   The Gupta Textbook contains a section on Fipronil stating, under the heading "Pharmacokineticx / Toxicokinetics", that: "Fipronil in

Frontline® preparation (132 mg in a 1.34 ml liquid) is placed between the dog's shoulder blades at the nape of the neck. After application, fipronil spreads and sequester in the lipids of the skin and hair follicles, and continues to be released onto the skin and coal, resulting in long-lasting activity against fleas and ticks. Residue of fipronil lasts on dog's hair coat for about a month."[10]

c. Maddison, Jill, SMALL ANIMAL CLINICAL PHARMACOLOGY (2007) ("Maddison Textbook") is a textbook used to train veterinarians.

   i. Merial provided information to be placed in the Maddison Textbook.

   ii. The Maddison Textbook states, under the heading "Pharmacokinetics", that: "Fipronil is not thought to be significantly absorbed from topical sites of application but to translocate dermally, being confined to the lipids in the hair follicles and sebaceous glands. From this reservoir, drug is released for many weeks, accounting for the sustained activity against fleas and ticks."[11]

36. The research cited by Merial in the foregoing paragraph in support of Merial's Translocation Claim is false, deceptive and inaccurate.

37. Upon information and belief, Merial willfully and knowingly made and disseminated the foregoing false Merial Translocation Claim to induce veterinarians to recommend, prescribe, sell, or dispense Merial Products and to cause consumers to purchase Merial Products.

---

[10] Gupta Textbook, Ch. 43, "Fipronil," p. 502-03.

[11] Maddison Textbook, p. 229.

### 3.     Defendants' Products Do Not Disperse

38.  The Active Ingredients within Defendants' Products only adhere to a tiny portion of a Pet's body where the Active Ingredients were applied using Defendants' Product Spot On Treatment.

39.  The Active Ingredients do not, of their own accord, spread to cover other portions a Pet's body where the Active Ingredients were not applied using the Defendants' Product Spot On Treatment.

40.  Following the use of Defendants' Products by applying Defendants' Spot On Treatment, fleas and ticks on a Pet will not come into contact with the Active Ingredients and consequently will not be killed by the Active Ingredients unless the fleas and ticks on a Pet move into the area on the Pet where the Defendants' Spot On Treatment was applied and come into physical contact with the Active Ingredients.

41.  In order for the Active Ingredients to become present upon parts of a Pet's body other than the area where Defendants' Products were respectively applied using Defendants' Spot On Treatment, Defendants' Products must come into physical contact with another object that moves and disperses the Active Ingredients to such other locations on a Pet's body (the "Actual Active Ingredient Dispersion Process").

42.  There is no known scientific process capable of spreading the Active Ingredients in Defendants Products to other parts of a Pet's body by the methods of localizing the Active Ingredients in the lipid layer, cutaneous exchange dispersion, the physicochemical properties of the Active Ingredients, wicking, translocation, or any other of Defendants' many descriptions of Defendants' Translocation Claims (the "Active Ingredients Dispersion Limitation").

43. Based upon information belief, at all times relevant, Defendants willingly and knowingly failed to inform Plaintiff, consumers and the proposed Class about:

    a.  the Actual Active Ingredient Dispersion Process; and

    b.  the Active Ingredients Dispersion Limitation.

**B.    Defendants' Monthly Application Claims are False**

44. Bayer asserts in its marketing, advertising, and promotional materials for Bayer Products that its products are effective for one month after application when applied to a Pet via the Bayer Product Spot On Treatment (the "Bayer One Month Claim").

45. Merial asserts in its marketing, advertising, and promotional materials for Merial Products that its products are effective for one month after application when applied to a Pet via Merial Product Spot On Treatment (the "Merial One Month Claim" and collectively with the "Bayer One Month Claim" are "Defendants' One Month Claims").

46. Defendants' One Month Claims are false, misleading and deceptive.

**1.    Defendant Bayer's Specific False One Month Claim Statements**

47. Bayer made the following claims:

    a.  "After topical application of the product, imidacloprid is rapidly distributed over the animal's skin within one day of application. It can be detected on the body surface throughout the 28-day treatment interval.  Imidacloprid localizes in the lipid layer of the skin surface, which spreads not only over the surface of the skin but also onto the hair."[12]

———————————————

[12] http://www.animalhealth.bayerhealthcare.com/4890.0.html

b. the Advantage® II For Dogs label states: "Under normal conditions the product is effective for a month."

c. the Advantage Multi® II For Dogs label states: "Advantage Multi for Dogs should be administered at one-month intervals."

d. Bayer's website has a chart showing the effectiveness of Bayer Products as shown below:[13]



e. Bayer tells consumers: "It's a relief to know that Advocate can protect animals against sources of dangerous diseases for four weeks with just one very convenient treatment. Is administration difficult? It couldn't be easier. Just a spot on the skin of the animal assures protection for four weeks: a single product creating a full spectrum shield that takes no more than 20 seconds to set up. Advocate stems from the Advantage family – in other words, from Bayer

---

[13] http://www.animalhealth.bayerhealthcare.com/4903.0.html#

HealthCare. This means you can count on not just a product, but on worldwide experience in parasite control, in-depth knowledge, superb service and the high quality Bayer HealthCare is know for. In other words, you get not simply an endectocide, but something truly outstanding: A complete, well rounded, intelligent solution."[14]

48. The Bayer One Month Claim described in the foregoing paragraph is false, deceptive and inaccurate.

49. Bayer utilizes the research to support the Bayer Translocation Claim.

a. Kramer & Mencke state in, FLEA BIOLOGY AND CONTROL, p. 109. that: "A summary of the study is that 9.1% imidacloprid solution applied as a low-volume spot treatment at dosages of 7.5 to 10 mg/kg kills fleas on dogs within 24 hours, with highly effective residual efficacy extending through 34 days (Arther et. al. 1997b). Application at monthly intervals will break the flea life cycle because of its killing effect within 24 hours before egg production by adult fleas begins (Arther et al. 1997b)."

b. Kramer & Mencke state that: "[imidacloprid] is spread through the coat of dogs and the fur of cats within twelve hours post application (p.a.) to cover the entire body and could be detected in studies of Fichtel (1998) in this medium over the whole 28 day period after application."

c. 2010 Study states that: "Between days 7 and 28, the levels of imidacloprid-derived radioactivity present in the hair from the lateral scapula, lateral thoraz,

—————————————

[14] http://www.animalhealth.bayerhealthcare.com/4888.0.html

and lateral hip sites ranged between 47 and 67, 60 and 85, and 60 and 100 ppm, respectively."[15]

    d.  2010 Study states that: "The results also demonstrated that radio labeled imidacloprid persisted within the skin and associated adnexa at the application site and at a distal lumbar site for up to 56 days after treatment."

50.  The research cited by Bayer in the foregoing paragraph in support of Bayer's One Month Claim is false, deceptive and inaccurate.

51.  Upon information and belief, Bayer willfully and knowingly made and disseminated the foregoing false Bayer One Month Claim to induce veterinarians to recommend, prescribe, sell, or dispense Bayer Products and to cause consumers to purchase Bayer Products.

### 2.    Defendant Merial's Specific False One Month Claim Statements

52.  Merial made the following claims:

    a.  Frequently Asked Questions ("FAQs") for Frontline, located at http://frontline.us.merial.com/hlp_faq.asp states: "How do FRONTLINE® Top Spot and FRONTLINE® Plus spread over a pet's body?  How long does this take? FRONTLINE® Top Spot and Plus spread over the pet's body by a process called translocation. When applied, these products are gradually dispersed by the pet's natural oils, collecting in the oil glands in the skin. It is then "wicked" onto the hair over the next 30 days. The translocation process can take up to 24 hours to complete."

---

[15]https://s3.amazonaws.com/assets.prod.vetlearn.com/10/8f14e06c5411e090fc0050568d17ce/file/VTX1210_chopade.pdf

b.  Merial has published an advertisement in Trends Magazine, amongst other publications, with the title "How It Works Is Why It Works So Well"[16] stating "Stored in the sebaceous glands, FRONTLINE® Plus is wicked out of the hair follicles and continuously re-applied to the coat to provide long-lasting, waterproof protection."

c.  Merial's Complete Killer Campaign also has a page entitled "Questions Answered."[17]  The Questions Answered states "**How does the killing force of FRONTLINE® Plus kill fleas and ticks?**  Aside from their sweet ninja moves, the force has two secret weapons: fipronil and (S)-methoprene. Once FRONTLINE® Plus is applied, this combo stores itself in the oil glands under your pet's skin. It then self-distributes continuously for one month to your pet's hair and skin through the hair follicles. Any flea or tick that comes in contact with your pet is dead meat."

53.   The Merial One Month Claim process described in the foregoing paragraph is false, deceptive and inaccurate.

54.   Merial utilizes the following research to support the Merial One Month Claim.

a.  The Veterinary Drug Handbook Fourth Edition contains a section on Fipronil that states, under the heading "Pharmakokinetics", that:  "Following topical application, [Fipronil] apparently spreads over the body by translocation (over

_____

[16] http://content.yudu.com/A1nb98/Apr2010/resources/50.htm

[17] http://www.completekiller.com/killing-101/questions-answered/

whole body in about 25 hours). Manufacturers information: collects in skin oils and hair follicles, then released over a long period of time."

b. The Gupta Textbook contains a section on Fipronil stating, under the heading "Pharmacokineticx / Toxicokinetics", that: "Fipronil in Frontline® preparation (132 mg in a 1.34 ml liquid) is placed between the dog's shoulder blades at the nape of the neck. After application, fipronil spreads and sequester in the lipids of the skin and hair follicles, and continues to be released onto the skin and coal, resulting in long-lasting activity against fleas and ticks. Residue of fipronil lasts on dog's hair coat for about a month."[18]

c. The Maddison Textbook states, under the heading "Pharmacokinetics", that: "Fipronil is not thought to be significantly absorbed from topical sites of application but to translocate dermally, being confined to the lipids in the hair follicles and sebaceous glands. From this reservoir, drug is released for many weeks, accounting for the sustained activity against fleas and ticks."[19]

55. The research cited by Merial in the foregoing paragraph in support of Merial's One Month Claim is false, deceptive and inaccurate.

56. Upon information and belief, Merial willfully and knowingly made and disseminated the foregoing false Merial One Month Claim to induce veterinarians to recommend, prescribe, sell, or dispense Merial Products and to cause consumers to purchase Merial Products.

---

[18] Gupta Textbook, Ch. 43, "Fipronil," p. 502-03.

[19] Maddison Textbook, p. 229.

### 3. The Actual Longevity of Defendants' Products

57. Defendants' One Month Claims are false, deceptive and misleading. Following the use of Defendants' Products by application through Defendants' Spot On Treatment, fleas and ticks on a Pet will not come into contact with the Active Ingredients and consequently will not be killed over the next 30 days by the Active Ingredients unless the fleas and ticks on a Pet move into the area on the Pet where the Defendants' Spot On Treatment was applied and come into physical contact with the Active Ingredients.

58. The Active Ingredients in Defendants' Products are highly degradable in water, sunlight, and other natural Pet environmental factors. Studies conducted on the Active Ingredients in Defendants' Products show that the Active Ingredients have a short half-life. No data has been provided that would support the inference that diluted dosages of the Active Ingredients found in Defendants' Products would be more resistant to degradation.

59. There is no reason why the Active Ingredients in Defendants' Products would support Defendants' One Month Claims and Defendants have failed to provide a proper scientific basis for their One Month Claims.

60. Based upon information belief, at all times relevant, Defendants willingly and knowingly failed to inform Plaintiffs, consumers and the proposed Class that Defendants' One Month Claims are false and misleading.

### C. Defendants' Products Enter the Bloodstream

61. Bayer asserts in its marketing, advertising, and promotional materials for Bayer Products that, within a matter of hours after applying a Bayer Product Spot On Treatment, Imidacloprid will spread by "translocation" over all or most of the skin surface area and hair of the

Pet that received the Bayer Product Spot On Treatment. Bayer Claims that the Bayer Product will not enter into the Pet's bloodstream (the "Bayer Bloodstream Claim").

62. Merial asserts in its marketing, advertising, and promotional materials for Merial Products that, within a matter of hours after applying a Merial Product Spot On Treatment, Imidacloprid will spread by "translocation" over all or most of the skin surface area and hair of the Pet that received the Merial Product Spot On Treatment. Merial Claims that the Merial Product will not enter into the Pet's bloodstream (the "Merial Bloodstream Claim" together with the "Bayer Bloodstream Claim" are referred to as "Defendants' Bloodstream Claims").

63. Upon information and belief, Defendants' Bloodstream Claims are false.

**1.      Defendant Bayer's Specific False Bloodstream Claim Statements**

64. Bayer made the following claims:

a.   "After topical application of the product, imidacloprid is rapidly distributed over the animal's skin within one day of application. It can be detected on the body surface throughout the 28-day treatment interval. Imidacloprid localizes in the lipid layer of the skin surface, which spreads not only over the surface of the skin but also onto the hair."[20]

b.   "Clinical and laboratory studies have shown that imidacloprid is distributed over the surface of the skin of treated animals. In the environment in which the animal lives, physiological cutaneous exchange disperses the cutaneous detritus (scurf) which carries infinitesimal quantities of imidacloprid."

---

[20] http://www.animalhealth.bayerhealthcare.com/4890.0.html

c.   In a document entitled "Pharmacokinetics" Bayer states, "Studies using flea cages on cats and similar feeding studies in dogs have demonstrated that imidacloprid acts on adult fleas on contact and not by uptake from blood meals."[21]

65.  Upon information and belief, the Bayer Bloodstream Claim described in the foregoing paragraph is false, deceptive and inaccurate.

66.  Bayer utilizes the following research to support the Bayer Translocation Claim:

a.   The Riviere & Papich Book states, under the heading "Pharmacokinetics", that: "Topical application of imidacloprid to the skin does not result in significant dermal absorption in the bloodstream, but rather surface translocation aided by body movement resulting in whole body coverage.  Its efficacy is dependent on contact with the flea at the surface of the animal's skin.[22]"

67.  The research cited by Bayer in the foregoing paragraph in support of Bayer's Bloodstream Claim is false, deceptive and inaccurate.

68.  Upon information and belief, Bayer willfully and knowingly made and disseminated the foregoing false Bayer Bloodstream Claim to induce veterinarians to recommend, prescribe, sell, or dispense Bayer Products and to cause consumers to purchase Bayer Products.

**2.     Defendant Merial's Specific False Bloodstream Claim Statements**

69.  Merial made the following claims:

---

[21]http://www.advocatespoton.com/fileadmin/media/advocate/pdf/
Advocate_TM_2_Pharmacokinetics.pdf

[22] Riviere & Papich Book, p. 1188.

a. Frequently Asked Questions ("FAQs") for Frontline, located at http://frontline.us.merial.com/hlp_faq.asp states: "FRONTLINE Brand Products are not systemically active and have no known adverse interactions with systemic medications."[23]

b. Merial has published an advertisement in Trends Magazine, amongst other publications, with the title "How It Works Is Why It Works So Well"[24] stating "Stored in the sebaceous glands, FRONTLINE® Plus is wicked out of the hair follicles and continuously re-applied to the coat to provide long-lasting, waterproof protection."

70.   The Merial Bloodstream Claim process described in the foregoing paragraph is false, deceptive and inaccurate.

71.  Merial utilizes the following research to support the Merial Bloodstream Claim.

a. The Veterinary Drug Handbook Fourth Edition contains a section on Fipronil that states, under the heading "Pharmakokinetics", that:   "Following topical application, [Fipronil] apparently spreads over the body by translocation (over whole body in about 25 hours). Manufacturers information: collects in skin oils and hair follicles, then released over a long period of time."

b. The Maddison Textbook states, under the heading "Pharmacokinetics", that: "Fipronil is not thought to be significantly absorbed from topical sites of application but to translocate dermally, being confined to the lipids in the hair

---

[23] http://frontline.us.merial.com/hlp_faq.asp

[24] http://content.yudu.com/A1nb98/Apr2010/resources/50.htm

follicles and sebaceous glands. From this reservoir, drug is released for many weeks, accounting for the sustained activity against fleas and ticks."[25]

72. The research cited by Merial in the foregoing paragraph in support of Merial's Bloodstream Claim is false, deceptive and inaccurate.

73. Based upon information and belief Merial willfully and knowingly made and disseminated the foregoing false Merial Bloodstream Claim to induce veterinarians to recommend, prescribe, sell, or dispense Merial Products and to cause consumers to purchase Merial Products.

3.     **The Active Ingredients Enter the Bloodstream**

74. Defendants' Bloodstream Claims are false. Following the use of Defendants' Products by applying Defendants' Spot On Treatment certain amounts of the Active Ingredient enter the bloodstream.

75. Defendants have not cited to any data showing that the Active Ingredients in Defendants' Products do not enter the bloodstream of Pets. Defendants' claim that the chemicals in Defendants' Products permeate into the lipid layer of Pets but not the bloodstream is unsupportable.

76. Upon information belief, at all times relevant, Defendants willingly and knowingly failed to inform Plaintiffs, consumers and veerinarians that Defendants' Bloodstream Claim is false.

D.     **Defendants' Products Are Not Resistant to Shampoo and Swimming**

77. Bayer asserts in its marketing, advertising, and promotional materials for Bayer Products that shortly after applying a Bayer Product Spot On Treatment, the imidacloprid will resist wearing off from a Pet's exposure to shampoo, rain, swimming and sunlight. (the "Bayer Resistance Claim").

---

[25] Maddison Textbook, p. 229.

78. Merial asserts in its marketing, advertising, and promotional materials for Merial Products that shortly after applying a Merial Product Spot On Treatment, the fipronil will resist wearing off from a Pet's exposure to shampoo, rain, swimming and sunlight. (the "Merial Resistance Claim" and together with the "Bayer Resistance Claim", collectively the "Defendants' Resistance Claims.").

79. Defendants' Resistance Claims are false, deceptive and inaccurate.

**1.     Defendant Bayer's Specific False Resistance Claim Statements**

80. Bayer made the following claims:

    a.  Bayer states "No need to reapply after weekly swimming or a bath."[26]

    b.  the Advantage® II For Dogs label states: "Advantage II is waterproof and remains effective following a shampoo treatment, swimming, or after exposure to rain or sunlight."

    c.  the Advantage Multi® II For Dogs label states: "Shampooing or water immersion 4 days after treatment will not reduce the effectiveness of Advantage Multi for Dogs in the treatment of flea infestations."

    d.  Bayer's K9 Advantix II website states: "Does your dog love the water? No problem! K9 Advantix II is waterproof. Studies have shown your dog will still be protected after exposure to water—whether your dog has gone for a swim, has been given a bath or has been in the rain. This waterproof protection can be used on puppies as young as seven weeks of age."[27]

---

[26] http://www.petparents.com/show.aspx/products/advantage-ii-for-dogs/features-and-benefits

[27] http://www.petparents.com/show.aspx/products/k9-advantix-ii

81. The Bayer Resistance Claim process described in the foregoing paragraph is false, deceptive and inaccurate.

82. Bayer utilizes the following research to support the Bayer Resistance Claim.

    a. Kramer & Mencke state: "Single shampoo/rinse procedure four days after treatment with Advantage® did not significantly decrease the residual flea control for up to four weeks. Efficacy following repeated infestation remained above 90% for three of the four flea count periods through day 28 (Arther et al. 1997a; Cunningham et al. 1997b)…Immersion of treated dogs at weekly intervals, simulating swimming or rainfall, had as well negligible effect on the residual efficacy over 28 days…"[28]

    b. The 2010 Study states: "The presence of $^{14}$C radioactivity within hair follicles, sebaceous glands, and on the skin surface strongly supports imidacloprid's efficacy against fleas on dogs and cats despite post-treatment bathing, shampooing, and/or swimming." [29]

83. The research cited by Bayer in the foregoing paragraph in support of the Bayer Resistance Claim is false, deceptive and inaccurate.

84. Upon information and belief, Bayer willfully and knowingly made and disseminated the foregoing false Bayer Resistance Claim to induce veterinarians to recommend, prescribe, sell, or dispense Bayer Products and to cause consumers to purchase Bayer Products.

---

[28] p. 149.

[29]https://s3.amazonaws.com/assets.prod.vetlearn.com/10/8f14e06c5411e090fc0050568d17ce/file/VTX1210_chopade.pdf

### 2. Defendant Merial's Specific False Resistance Claim Statements

85. Merial made the following claims:

    a. Frequently Asked Questions ("FAQs") for Frontline, located at http://frontline.us.merial.com/hlp_faq.asp states: "How long after application can my pet be bathed or go swimming?  FRONTLINE Brand Products remain effective for 30 days, even if a pet swims or is bathed.  After application, keep the dog or cat from getting wet until the application area appears dry, usually 24 hours.  If a FRONTLINE Brand Product is to be applied after a bath, make sure the pet is completely dry before application."

    b. Merial has published an advertisement in Trends Magazine, amongst other publications, with the title "How It Works Is Why It Works So Well"[30] stating "Stored in the sebaceous glands, FRONTLINE® Plus is wicked out of the hair follicles and continuously re-applied to the coat to provide long-lasting, waterproof protection."

86. The Merial Resistance Claim process described in the foregoing paragraph is false, deceptive and inaccurate.

87. Merial utilizes the following research to support the Merial Resistance Claim.

    a. The Maddison Textbook states, under the heading "Pharmacokinetics", that: "Fipronil is not thought to be significantly absorbed from topical sites of application but to translocate dermally, being confined to the lipids in the hair

---

[30] http://content.yudu.com/A1nb98/Apr2010/resources/50.htm

follicles and sebaceous glands. From this reservoir, drug is released for many weeks, accounting for the sustained activity against fleas and ticks."[31]

b. The Veterinary Drug Handbook Fourth Edition contains a section on Fipronil stating: "Remains effective after bathing (but do not shampoo within 48 hours of application), water immersion or exposure to sunlight."

88. The research cited by Merial in the foregoing paragraph in support of Merial's Resistance Claim is false, deceptive and inaccurate.

89. Upon information and belief, Merial willfully and knowingly made and disseminated the foregoing false Merial Resistance Claim to induce veterinarians to recommend, prescribe, sell, or dispense Merial Products and to cause consumers to purchase Merial Products.

### 3. The Actual Resistance Process

90. Defendants' Resistance Claims are false. Following the use of Defendants' Products by applying Defendants' Spot On Treatment, fleas and ticks on a Pet will not come into contact with the Active Ingredients and consequently will not be killed over the next 30 days by the Active Ingredients, unless the fleas and ticks on a Pet move into an area on the Pet where the Defendants' Products were respectively applied and come into physical contact with the Active Ingredients.

91. The Active Ingredients in Defendants' Products are highly degradable in water, sunlight, and other natural Pet environmental factors.

92. Publications, including Defendant Bayer's own label, advise consumers that Defendants' Products are easily removed by washing Pets. For example:

_____

[31] Maddison Textbook, p. 229.

29

a. In an article entitled "Farnam's Bio Spot Flea & Tick Almost Killed Our Dog", at www.biospotvictims.org, stated: "what to do if your pet is having an adverse reaction to a flea control product…BATHE YOUR PET WITH A MILD DISH DETERGENT (SUCH AS DAWN), AND RINSE WITH LARGE AMOUNTS OF WATER."

b. the Advantage® II For Dogs label states under "FIRST AID": "Have the product container or label with you when calling a poison control center or doctor, or going for treatment…If on skin: Wash with plenty of soap and water."

## VI.    Class Action Allegations

93.  Plaintiffs bring this action on behalf of themselves and a Class consisting of all persons who purchased Defendants' Products.

94.  The Class is preliminarily defined as all persons who purchased Defendants' Products within the applicable statute of limitations period.

95.  Plaintiffs are members of the Class that they seek to represent.

96.  Upon information and belief, Defendants sold Defendants' Products to the public or to veterinarians who recommend, prescribe, sell, or dispense Defendants' Products.

97.  At all times relevant, Defendants sold Defendants' Products pursuant to Defendants' False Claims in order to cause veterinarians and consumers to rely upon Defendants' False Claims and to purchase Defendants' Products.

98.  Through its sales, marketing, and advertising of Defendants' Products, Defendants are abusing the trust of consumers and veterinarians, and the love such consumers and veterinarians feel for Pets.

99. Upon information and belief, Plaintiffs and the Class relied upon the Defendants' False Claims when purchasing Defendants' Products.

100. Upon information and belief, Defendants' gross annual sales of Defendants' Products exceeds $2 billion. Defendants generate enormous profits selling Defendants' Products pursuant to the Defendants' False Claims.

101. Plaintiffs and the Class have been damaged as a result of their reliance upon the Defendants' False Claims by, including but not limited to:

      a.    Losing the money they invested to purchase Defendants' Products;

      b.    Being deceived into believing that Defendants' Products:

            i.    are self-dispersing and cover the entire surface area of a Pet;

           ii.    are effective for one month and require monthly application to continue to be effective;

         iii.    do not enter the blood stream of a Pet and instead move across the Pet's skin to cover the Pet; and

         iv.    are waterproof and remain effective following shampoo treatments, swimming, or after exposure to rain or sunlight.

102. Defendants are liable to make restitution to Plaintiffs and the Class of all sums consumers paid for Defendants' Products and Defendants should otherwise be enjoined from selling Defendants' Products pursuant to Defendants' False Claims.

**A.    Numerosity**

103. At this time, Plaintiffs do not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiffs believe that Class members number in the

millions and, thus, are so numerous that joinder of all members is impracticable. The number of class members can be determined through appropriate discovery.

## B.    Typicality

104.  Plaintiffs' claims are typical of the claims of the class because they and all of members of the class have purchased Defendants' Products manufactured by Defendants and have been placed in the stream of commerce by Defendants all of which are substantially identical.

## C.    Commonality

105.  There are numerous common questions of law and fact relative to Plaintiffs and the Class that predominate over any questions affecting only individual Plaintiffs or Class members, including but not limited to the following:

a.    Whether Defendants' False Claims were false;

b.    Whether Defendants' Products work as advertised, marketed, and conveyed to veterinarians and consumers;

c.    Whether Defendants' Products were merchantable for use;

d.    Whether defects in Defendants' Products were discoverable by a reasonable inspection of Defendants' Products;

e.    Whether Defendants were negligent in selling Defendants' Products;

f.    Whether Defendants knew that their advertising and sales of Defendants' Products contained false information and that Defendants' Products would not work as advertised;

g.    Whether Defendants' False Claims, advertising and sales of the Products caused harm to Plaintiffs and the Class;

h.    Whether Defendants' actions were deceptive for purposes of applicable consumer protection acts; and

i.    Whether Plaintiffs and the Class are entitled to an injunction, damages, including incidental, consequential, punitive, and exemplary damages and other relief.

106. All common questions of fact and law are best resolved through this lawsuit.

**D.     The Prerequisites of Fed. R. Civ. P. 23(b)(2) are Satisfied**

107. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.

108. Plaintiffs have no claims antagonistic to those of the Class.

109. Plaintiffs have retained competent and experienced counsel in complex class actions and consumer actions.

110. Counsel is committed to the vigorous prosecution of this action.

111. The prerequisites to maintaining a class action for injunctive and equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist as Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

112. The prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

113. Defendants' actions are generally applicable to the Class, and Plaintiffs, on behalf of the Class seek damages and injunctive relief described herein.

114. Defendants' systemic policy and practices make injunctive relief with respect to the Class as a whole appropriate.

**E.     The Prerequisites of Fed. R. Civ. P. 23(b)(3) are Satisfied**

115. This case satisfies the prerequisites of Fed. R. Civ. P. 23(b)(3). The common questions of fact and law enumerated above predominate over any possible questions affecting individual

members of the Class.  A class action is the superior method for fair and efficient adjudication of this controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense, as well as technical knowledge necessary to conduct the litigation, especially in view of the relatively modest amount of monetary, injunctive and equitable relief at issue for each individual member of the Class.  This action will be prosecuted in a fashion to ensure the Court's able management of this case as a class action on behalf of the Plaintiffs and the Class.

**COUNT I: INJUNCTIVE RELIEF**

**(AGAINST ALL DEFENDANTS)**

116.  Plaintiffs repeat, reiterate and re-allege each and every allegation set forth in the prior paragraphs with the same force and effect as though set forth fully herein.

117.  Injunctive relief is appropriate under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 65. Defendants are procuring, or suffering to be done, acts in violation of the Plaintiffs' and the Class's rights respecting the subject matter of the action.  Plaintiffs and the Class are entitled to a judgment that will enjoin Defendants from continuing to deceive Plaintiffs and the Class, and to prevent Defendants from receiving financial compensation through Defendants' false and misleading advertising, marketing, and sales promotion efforts during the pendency of the class action and thereafter.

118.  Plaintiffs and the Class have made a clear showing of the likelihood of the success on the merits because the truth, contrary to Defendants' False Claims are demonstrably impossible.

119.  Plaintiffs and the Class have and will continue to suffer irreparable harm through Defendants' False Claims.  Allowing Defendants to continue their wrongful practices would place

Plaintiffs and the Class at risk of harm by continuing purchase Defendants' Products pursuant to Defendants False Claims.

120.  The balance of equities favors Plaintiffs and the Class because Defendants' False Claims continue to put Plaintiffs, the Class members and their Pets at risk.   Further, it would be inequitable to continue to allow Defendants to reap the monetary benefits derived through selling Defendants Products pursuant to Defendants False Claims during the pendency of the litigation, the trial and thereafter.

121.  The injunction is in the public interest to prevent and restrain Defendants from continuing their wrongful sales practices.

### COUNT II: CONSUMER FRAUD AND DECEPTIVE PRACTICES, 805 ILCS 505/1, *ET SEQ.*
### (AGAINST ALL DEFENDANTS)

122.  Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

123.  Defendants willfully or knowingly engaged in and continue to engage in materially deceptive and misleading representations and omissions aimed at deceiving reasonable consumers, the public, and Veterinarians as to the true facts of Defendants' Products and their performance.

124.  Defendants have in the past and at present marketed and advertised Defendants' Products Veterinarians and consumers through and by the misleading representations and omissions made in Defendants' False Claims:

    a.    Representing that Defendants' Products perform in a manner consistent with Defendants' False Claims;

    b.    Failing to disclose that Defendants' Products do not perform in a manner consistent with Defendants' False Claims.

124.    At all times relevant, there existed that certain statute in Illinois known as the Consumer Fraud Act, 815 ILCS 505/1, et seq. (the "CFA").

125.    Defendants' False Claims fall within and satisfy the definition of an advertisement pursuant to Section 1(a) of the CFA.

126.    Defendants' Products fall within and satisfy the definition of "merchandise" pursuant to Section 1(b) of the CFA.

127.    Defendants' sale of Defendants' Products to consumers in Illinois, veterinarians, Plaintiffs and the Class falls within and satisfies the definition of "sale" pursuant to Section 1(c) of the CFA.

128.    Defendants' sale of Defendants' Products to consumers, veterinarians in Illinois, Plaintiffs and the Class directly and/or indirectly affects the people of the State of Illinois.

129.    The CFA prohibits unfair methods of competition and unfair or deceptive acts or practices as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

130.    Defendants' advertising, marketing and promotional materials, company-sponsored veterinary medical education materials, company-sponsored scientific publications and sales of Defendant's Products which contain Defendants' False Claims:

a.    are deceptive;

b.    use or employ deception;

c.    use or employ fraud;

d.    use or employ false pretense;

e.    use or employ false promises;

f.    use or employ misrepresentation;

g.    use or employ the concealment, suppression and omission of material facts;

h.    are made by Defendants with the intent that others rely upon the concealment, suppression or omission of such material fact;

i.    are made by Defendants with the intent that others rely upon the concealment, suppression or omission of such material fact;

j.    use and employ practices described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965; and

k.    violate Section 2 of the CFA.

131.    Plaintiffs and the Class suffered actual damage as a result of Defendants' violation of the CFA, including but not limited to the sums Plaintiffs spent to purchase Defendants' Products.

132.    Plaintiffs and the Class are entitled to recover from Defendants, as actual damages, an amount equal to all revenues Defendants generated from the sales of Defendants' Products, which amount, based upon information and belief, exceeds $1 billion annually in each year that

Defendants sold Defendants' Products within the applicable statute of limitations and, as such, exceeds $3 billion.

133.    Plaintiffs and the Class are entitled to recover from Defendants punitive damages

134.    Plaintiffs and the Class are entitled to injunctive relief against Defendants, including but not limited to an injunction that prohibits Defendants from marketing, advertising and selling Defendants' Products pursuant to Defendants' False Claims and that requires Defendants to correct the misinformation it disseminated in the marketplace as a result of Defendants' False Claims.

135.    Defendants are liable to Plaintiffs and the Class for all actual damages Plaintiffs suffered, for punitive damages and for all other damages and relief that is available at law.

## COUNT III: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (AGAINST ALL DEFENDANTS)

136.  Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

137.  Defendants' Products constitute "goods" within the meaning of the Uniform Commercial Code.

138.  Defendants are "merchants" with respect to Defendants' Products.

139.  Defendants' Products are not merchantable.

140.  Defendants' Products would not pass without objection in the trade, nor is it fit for the ordinary purposes to which Defendants' Products are used for because Defendants' Products do not work in a manner consistent with Defendants' False Claims.

141.  Plaintiffs and the Class are entitled to revoke their acceptance of Defendants' Products because the defects in Defendants' Products are not discoverable by any reasonable inspection prior

to acceptance of Defendants' Products and because, in order to discover the defects in Defendants' Products, Plaintiffs must have access to expensive scientific equipment to determine whether or not Defendants' Products perform as represented in Defendants' False Claims.

142. Defendants' conduct as alleged herein violates the implied warranty of merchantability Defendants made relative to Defendants' Products.

143. As a result of Defendants' conduct as alleged herein, Plaintiffs and the Class are entitled to: 1) return any unused portions of the Defendants' Products product they purchased to Defendants; 2) receive and recover from Defendants a full refund of the purchase price for Defendants' Products; 3) receive and recover from Defendants all costs, expenses and attorneys' fees Plaintiffs and the Class incurred in this lawsuit; and 4) receive and recover from Defendants any and all incidental and consequential damages which Plaintiffs and the Class suffered as a result of purchasing Defendants' Products.

## COUNT IV: BREACH OF EXPRESS WARRANTY
## (AGAINST ALL DEFENDANTS)

144. Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

145. Defendants sold Defendants' Products with and pursuant to an express written warranty ("Warranty").

146. Defendants' Warranty included affirmations and representations that Defendants' Products worked in a manner consistent with the Defendants False Claims.

147. Defendants' Warranty included affirmations and representations concerning the results that Plaintiffs and the Class may reasonably expect from the ordinary usage of Defendants' Products.

148.  Defendants' Warranty was part of the "basis of the bargain" as that term is used in the Uniform Commercial Code.

149.  Defendants' Warranty is presumed to be part of the contract between Plaintiffs and the Class, on the one hand, and Defendants, on the other hand.

150.  Plaintiffs and the Class relied on Defendants' skill and judgment relative to Defendants' Warranty.

151.  Defendants breached Defendants' Warranty by selling Defendants' Products to Plaintiffs and the Class pursuant to Defendants' False Claims when Defendants' Products do not perform in a manner consistent with Defendants' Warranty.

152.  Any limits Defendants placed upon Defendants' Warranty are unenforceable because , upon information and belief, Defendants knowingly and willfully sold Defendants' Products, a defective product, without conspicuously informing consumers, including Plaintiffs and the Class, that Defendants' Products do not perform in a manner consistent with Defendants' False Claims.

153.  Thus, Plaintiffs and the Class did not receive the goods expressly warranted by Defendants.

154.  Defendants' Warranty is unconscionable.

155.  Defendants' breaches of Defendants' Warranty directly and proximately caused the damages sustained by Plaintiffs and the Class.

**COUNT V: VIOLATION OF MAGNUSON-MOSS**
**WARRANTY ACT, 15 U.S.C. § 2310(D)(1)**

**(AGAINST ALL DEFENDANTS)**

156.  Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

157. Congress enacted the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (the "Act"), in 1975 in response to widespread complaints from consumers that many warranties were misleading, deceptive, and were not being honored.

158. To remedy this problem of deception and failure to honor warranties, the Act imposes civil liability on any "warrantor" for, *inter alia*, failing to comply with any obligation under a written warranty and/or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

159. The Act authorizes a "suit for damages and other legal and equitable relief." *Id.*

160. The Act authorizes the award of attorneys' fees *(id.*), and expressly authorizes class actions. *See* 15 U.S.C. § 2310(e).

161. Defendants are "warrantors" within the meaning of Section 2301(5) of the Act.

162. Plaintiffs and the Class are "consumers" within the meaning of Section 2301(3) of the Act.

163. Plaintiffs' proposed Class is appropriate under 15 U.S.C. §2310 because each individual claim is greater than $25, the total amount in controversy is greater than $50,000, and there are less than 100 named Plaintiffs.

164. Defendants expressly warranted Defendants' Products in writing within the meaning of Section 2301(6) of the Act and the Uniform Commercial Code ("Defendants' Warranty under the Act").

165. Defendants' breached Defendants' Warranty under the Act.

166. Defendants' impliedly warranted that Defendants' Products were merchantable and fit for a particular purpose, including that Defendants' Products would perform in a manner consistent with Defendants' False Claims ("Defendants' Implied Warranty under the Act").

167. Defendants' Implied Warranty under the Act is an implied warranty within the meaning of Section 2301(7) of the Act.

168. Defendants' Implied Warranty under the Act is an implied warranty within the meaning of Sections 2-314 and 2-315 of the Uniform Commercial Code.

169. Defendants breached Defendants' Implied Warranty under the Act.

170. Any limitation period on recovery or exclusions in any warranty by Defendants is unconscionable within the meaning of Section 2-302 of the Uniform Commercial Code and, therefore, is unenforceable, because, among other things, Plaintiffs and the Class lacked meaningful choice with respect to the terms of Defendants' Warranty under the Act and Defendants' Implied warranty under the Act due to unequal bargaining power and a lack of warranty competition.

171. Upon information and belief, Defendants knew that the Defendants' False Claims were false and that Defendants' Products did not work in a manner consistent with Defendants' False Claims.

172. Defendants had more than an adequate opportunity to cure or remedy the problem caused by Defendants' False Claims, which opportunity Defendants have not taken to date.

173. As a direct and proximate cause of Defendants breaches of Defendants' Warranty under the Act and Defendants' Implied Warranty under the Act, Plaintiffs and the Class suffered actual economic damages.

**WHEREFORE**, Plaintiffs request that this Honorable Court enter judgment in their favor and against Defendants and: (1) certify the Class set forth herein; (2) appoint Plaintiffs' Counsel as Class Counsel; (3) award injunctive relief preventing Defendants from continuing to sell Defendants Products pursuant to Defendants' False Claims; (4) award compensatory

damages in an amount greater than $8,000,000,000; (5) award punitive damages in an amount greater than $24,000,000,000; (6) award pre-judgment interest and post-judgment interest on all compensatory and punitive damages; (7) award all costs, expenses and attorneys' fees incurred by Plaintiffs and the Class; and (8) award any and all other relief to which this Court deems Plaintiffs and the Class are justly entitled.

Respectfully submitted,

THE HOWARD LAW FIRM LLC
*Attorneys for Plaintiffs*


/s David A. Howard
Attorney for Plaintiffs

David A. Howard
Michael J. Lotus
The Howard Law Firm LLC
307 North Michigan Avenue
Suite 1214
Chicago, Illinois 60601
t: (312) 372-7048
f: (312) 372-9239
dhoward@howardlawllc.com
mlotus@howardlawllc.com